IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:22CR541 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | |
| TIMOTHY SUTTON, | ) | <u>SENTENCING MEMORANDUM</u> |
| | ) | |
| Defendant. | ) | |

During the time covered by this offense, Dr. Timothy Sutton was the top prescriber of durable medical equipment (DME) in the State of Ohio. Based on his actions alone, the companies for whom he worked falsely billed over $14.5 million to government health programs for medically unnecessary DME and Genetic Tests. Defendant's fraudulent orders resulted in a total loss to these vital federal government health care programs of over $5.9 million.

Defendant was not the mastermind or the primary instigator of this fraud. But he was one of the most important pieces and critical actors, without whom the fraud could not have succeeded. Without his actions, the government would not have been defrauded and these limited resources would have been directed to those Medicare patients that had actual medical necessities. This is because the telemedicine companies that engage in DME and Genetic Test fraud require the cooperation of doctors for sale, like Defendant, to make the fraud work.

Defendant's crime was a serious one. One that has an outsized impact on the social safety framework that Medicare supports, and one that requires a significant punishment as contemplated in the parties' mutually agreed-to plea agreement to reflect the serious nature of the offense and provide ample deterrence to the Defendant and others in the same position.

Moreover, considering certain personal characteristics of Defendant as discussed infra, a sentence within the advisory Guidelines range agreed to in the Plea Agreement of 70 to 87 months, along with a mandatory consecutive sentence of 24 months incarceration for the violation of 18 U.S.C. § 1028A(a)(1), is sufficient but not greater than necessary to meet all of the § 3553(a) factors in this case.

I.  **DEFENDANT'S OFFENSE CONDUCT**

    A.  <u>DEFENDANT'S ROLE AS A GATEKEEPER RESULTED IN A LOSS OF OVER $5.9 MILLION TO THE GOVERNMENT</u>

Defendant is a licensed doctor with a specialty in occupational medicine. In 2018, he began working in telemedicine. This meant working for companies prescribing DME and genetic testing. As a doctor trained at Johns Hopkins University, one of the premier medical schools in the country, Defendant knew what it meant to examine patients, evaluate their medical condition, and prescribe necessary treatment. But his telemedicine work did not involve any such medical practice. Instead, Defendant was paid essentially to check boxes. In his "work," Defendant received pre-populated forms attesting to purported information about a patient. He cursorily reviewed the information to ensure that there was sufficient language to justify a brace or a screening test and then clicked the box to prescribe one. In so doing, Defendant by his own admission did not see, speak with, or communicate in any way with the patient. Nor did he exercise any independent medical evaluation about whether the patient needed the pre-designated DME or testing. Indeed, he could not have done so given the evidence that he often completed orders in less than a minute and sometimes issued as many as 25 prescriptions in as few as 15 minutes.

Despite performing no legitimate medical work or exercising any independent judgment, each time Defendant issued such a prescription, he attested that the information in the medical

2

record was "true, accurate, and complete." And in many cases, he asserted that he was issuing the prescription based on a discussion with the patient and an evaluation of the patient's condition, such as performing a laxity pivot test that would require physical manipulation of a patient. Defendant made these attestations knowing they were lies and knowing that they would be used to support claims to Medicare; in doing so, he defrauded the government and the taxpayers who fund federal healthcare programs.

This was not an isolated incident. Nor was it an accident. Defendant signed approximately 5,519 different claims, for 3,417 different beneficiaries. His claims justified approximately 23,344 unique medical items for the beneficiaries and often included multiple braces for the same beneficiary he never examined. This conduct represents serious, repeated criminal activity. The sheer number of prescriptions he issued, coupled with the critical role he played as the gatekeeper of the criminal scheme, resulted in over $5.9 million in actual losses to the federal healthcare program.

The Probation Officer determined that the intended loss amount (the amount billed to Medicare for the ordered equipment)—for Sentencing Guideline calculation purposes—was actually $14,649,388.10, and thus two levels higher than contemplated by the parties' plea agreement. Compare (R. 97: Final PSR, p. 8 ¶30) with (R. 90: Plea Agreement, ¶18, PageID 710). As indicated in footnote one on the same page of the Plea Agreement, the parties agreed to use a range between $3,500,000 and $9,500,000 for purposes of calculating the Sentencing Guidelines and acknowledged that the Probation Office could find additional sentencing enhancements and offense characteristics. The United States intends to abide by the stipulations in the Plea Agreement and recommend a sentence based on those stipulations.

### B. MEDICARE FRAUD HAS A SIGNIFICANT IMPACT ON THE COMMUNITY

Defendant's crime is serious not only because of the nature of the fraud, but also because of its consequences. Indeed, one important factor here is that fraud on government healthcare programs is not a victimless crime. When doctors and healthcare companies defraud government healthcare programs, they steal money directly from the innocent taxpayers who fund those programs. They also increase the costs for beneficiaries, many of whom live on fixed and limited incomes. Moreover, in many cases, these frauds deprive the beneficiaries, in whose name the fraud is committed, of future necessary benefits by using their benefits on unnecessary prescriptions. Perhaps most importantly, the money that is stolen is money that could go to legitimate medical treatments to help people in significant need. Such consequences affect real and vulnerable people, and not just a faceless bureaucracy.

And the impact is, unfortunately, massive. Indeed, according to press releases about "Operation Brace Yourself" (the name given to the investigation that first disrupted a large-scale DME fraud scheme), DME Fraud was one of the largest Medicare fraud schemes in U.S. history, and it was estimated to have cost the government over a billion dollars.[1] Healthcare fraud is, generally speaking, big business that costs United States citizens *billions* of dollars *every year*. These types of fraud, with their attendant consequences on the public fisc and individual beneficiaries, almost always rely on medical providers like Defendant because telemedicine companies or companies that sell DME or provide genetic testing cannot bill the government for these things unless a doctor with a medical degree attests that the treatment being prescribed is medically necessary. In this way, the system makes the doctor the gatekeeper. This makes sense

---

[1] https://www.fbi.gov/news/stories/billion-dollar-medicare-fraud-bust-040919

because it is reasonable to assume that a doctor who has been educated in the medical field and taken an oath to do no harm will not lie about what his patient needs and will take that grave responsibility seriously.

Perhaps most damning is the fact that Defendant's conduct continued after Operation Brace Yourself was made public and he was fully aware of the very illegal nature of his conduct. The evidence demonstrates that Defendant knew that other doctors billing Medicare were held criminally responsible for similar conduct, and he pointedly asked questions about how his own similar conduct was not also, in his own words, "Medicare Fraud." Yet, in spite of these warnings and red flags and his own good judgment, he continued to abuse the trust placed in him by the public and carried on in the scheme to defraud. The trust that the system, the public, and the individual beneficiaries place in doctors matters a great deal. And the fact that doctors who ignore this serious responsibility cause significant negative impacts on the community warrants consideration in fashioning Defendant's sentence.

## II.     BACKGROUND

Medicare is a taxpayer funded health care benefit program designed to care for the elderly and infirm. Medicare is a trust-based program that relies on the honesty and integrity of its participants to function properly. To provide timely care to its beneficiaries, Medicare pays claims upon receipt and trusts those submitting claims to comply with the law. The program relies on the honesty and integrity of the individuals and providers who are involved in delivering health care to its enrolled beneficiaries. As of the year 2023, it is estimated that over 65 million Americans are Medicare beneficiaries. This number includes some of the most vulnerable of our citizens.

Medicare is subdivided into multiple "parts." Part B covers physician services and laboratory tests, which includes cancer genomic, also known as cancer genetic, testing.

Laboratory cancer genetic tests do not predict a person's likelihood of developing cancer or whether they have cancer. It is used as a treatment tool when a person has a cancer diagnosis to determine best treatment methods for that individual and is therefore reimbursed by Medicare in limited circumstances, such as when it is medically necessary and ordered by a patient's treating physician for use in their treatment. Cancer genetic tests are expensive and cost the Medicare program thousands of dollars, depending on the type of genes tested.

## III.  DEFENDANT'S HISTORY AND CHARACTERISTICS

Although Defendant has no criminal history, this is not the first incident in his life reflecting on his character. Starting first with his childhood, as the son of a podiatrist, James Sutton, Defendant was provided with innumerable advantages to which many other defendants appearing in this Court can only dream. He proceeded to attend the Rochester Institute of Technology on a President's Scholarship and then obtained a master's degree from Case Western University. Capping this already impressive resume, Defendant obtained an M.D. from Johns Hopkins University, often considered the number one medical school in the United States if not the world, and began but did not complete an Anesthesiology residency at the University of Michigan Health System. These incredible opportunities and advantages meant that Defendant knew better and should have done better with his lot in life. Indeed, there is a well-founded reason society places a high level of respect, trust, faith and responsibility in medical professionals with pedigrees like Defendant's, and yet he betrayed that trust here.

Moreover, when he was 18 years old and still living with his parents, his father was similarly situated having also pled guilty to committing health care fraud in U.S. District Court in the Northern District of Ohio. (R. 97: Final PSR, p. 11 ¶51) (citing 1:99CR98).[2] Despite this

---

[2]  The PSR indicates that Defendant's father was convicted of making a false statement to DEA

clear warning that well-established physicians can still commit Medicare fraud, be caught and forced to face the consequences, he knowingly followed the same path. He turned a blind eye to what was obvious when he saw other physicians indicted in Operation Brace Yourself, and despite his own father's criminal conviction as well as his own conscience telling him to ask the "Medicare Fraud Question," he persisted in this conduct.

Finally, it is worth noting that this is not Defendant's first opportunity to get a "second chance," nor is it the first time he has abused his special position of trust and responsibility as a doctor. Remember his uncompleted residency at the University of Michigan Medical Center? Why did he not finish the residency? Because in December 2013, while he was working at the UM hospitals, and while he was in a position of trust for the medical system, its patients and the general public, he stole drugs meant for his patients and overdosed on them in a hospital bathroom.[3] He was resuscitated, arrested and charged with felonies in Michigan, but presumably received a second chance from the prosecutors, the state medical boards, and the court in that case given his once-promising prospects. He pled guilty to a misdemeanor offense that was promptly expunged,[4] thus permitting him to retain his medical license and remain in the public's trust.

Having forfeited his future as an extremely well-trained anesthesiologist, Defendant then transitioned to become an occupational medicine doctor and found gainful employment at Fireland Regional Medical Center in Sandusky, Ohio. He soon squandered this second chance.

---

(R. 97: Final PSR, p. 11 ¶51), which is true, but he also pleaded guilty to committing health care fraud as alleged in Count 2 of the Information and was ordered by Judge Polster to pay over $52,000 in restitution.

[3] https://www.mlive.com/news/ann-arbor/2014/04/police_u-m_doctor_overdosed_on.html

[4] https://www.mlive.com/news/ann-arbor/2014/06/u-m_doctor_who_overdosed_on_st.html

7

Rather than work at his $215,000-year salaried position at Firelands, he was reprimanded several times for engaging in secondary employment while at Firelands. He ultimately lost his second chance at Firelands when, in October 2020, after months of improperly accessing medical supply cabinets at Firelands, including helping himself to syringes and medications such as Lidocaine, Toradol and Dep Medrol, and receiving repeated counseling sessions, he was caught improperly disposing of medicines and used syringes in a public dumpster rather than through proper means.

Finally in the present case, he only stopped his conduct because he was caught. Humana investigators discovered his fraud and alerted him to the same by sending him a letter dated September 14, 2020. Again, rather than stop his conduct, in the period between when Humana sent him that letter and until he talked to the Humana investigator on October 9, 2020, he signed an additional 217 fraudulent claims. Notably, defendant committed these crimes as a well-paid, board-certified medical doctor. His education, training, and career provided opportunities not many people enjoy. He took an oath to do no harm and blindly signed hundreds of orders without showing any care whatsoever to the patients, bilking millions from the federal health care systems that trusted him. Generally, a medical doctor who abuses society's trust merits a harsher sentence than other offenders. See U.S.S.G. § 3B1.3. Indeed, "the reasoning behind § 3B1.3 is that defendants who abuse a position of trust deserve more severe punishment, not less." *United States v. Howard*, 28 F.4th 180, 212 (11th Cir. 2022) (rejecting doctor's argument that loss of medical license was mitigating factor favoring less severe sentence).

Abusing these trust-based systems diverts business away from other qualified providers at the expense of the elderly, the poor, and the infirm is a serious offense. Medicare and Medicaid fraud is "rampant"; it undermines the ability to care for society's most vulnerable members and thus requires serious punishment. *See United States v. Kuhlman*, 711 F.3d 1321,

1328 (11th Cir. 2013) (finding probation sentence substantively unreasonable); *Howard*, 28 F.4th at 206-08 (finding same in kickback case where doctor who signed hundreds of pharmacy orders for kickbacks and stating "Congress has determined that medical necessity and the best interest of the patient should be the *only* reason for a physician to write a prescription; kickbacks provide a baser, non-medical reason: making unauthorized money and lots of it." (emphasis in original)).

Licensed medical professionals, including doctors, hold positions of trust with respect to the patients they serve. Medicare-enrolled providers additionally hold a position of trust with respect to that federal health care benefit program. They have sworn and promised to, among other things, ensure patient safety (do no harm) and, when interacting with Medicare beneficiaries, abide by the laws, policies, procedures, rules, and regulations governing the Medicare program. To this end, Medicare-enrolled providers explicitly certify that they will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

The defendant made those promises. He exploited Medicare's trust by accepting payments in exchange for signing orders for medically unnecessary DME and laboratory tests for patients he did not know. Taxpayer funded programs like Medicare and Medicaid ultimately bore the brunt of the thousands of orders he signed. And the conspiracy targeted elderly and sometimes impoverished Medicare and Medicaid beneficiaries.

General deterrence is a particularly important consideration in this type of case. *See United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) (finding that a sentence for white-collar crime must reflect the need for general deterrence because these crimes are "especially susceptible to general deterrence"); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are 'more rational, cool, and calculated than

sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 WM. & MARY L. REV., 721, 724 (2005))). The need to deter crime within the health care industry is especially great. It has become "rampant" to the point the United States "lacks the resources to reach it all." *Kuhlman*, 711 F.3d at 1328. In the rare case where perpetrators are caught, "one of the primary objectives of the sentence is to send a message to other health care providers that [healthcare] fraud is a serious crime that carries with it a correspondingly serious punishment." *Id*. at 1328.

The fact the defendant received approximately $172,450,[5] or approximately $31 per order, makes the offense more serious, not less. By just signing his name on hundreds of orders over a matter of minutes, he generated a staggering loss to the Medicare programs for medically unnecessary tests and led to the millions of dollars that his co-conspirators pocketed. And the defendant only stopped because he was ultimately caught by a Humana fraud investigator. This was a crime of greed, convenience, and opportunity. Likewise, selling his integrity on the cheap caused non-monetary harm to a relatively large number of victims, here, hundreds and hundreds of affected Medicare and Medicaid beneficiaries.

Defendant was not a minor player but instead was integral to the success of the conspiracy. Without his willingness to sell his Medicare credentials and signature, the diagnostic testing laboratories could not have successfully billed and bilked Medicare and Medicaid. The defendant's conduct was motivated by greed. After he was confronted by Humana investigators on October 9, 2020, with the fraud, he made a big show of "resigning" from his co-conspirators'

---

[5] This amount includes payments from the co-conspirators to Defendant as reflected in his financial accounts as well as an additional approximately $30,000 he demanded for payment from the co-conspirators once he resigned from the telemedicine company.

company and carbon copied his resignation letters to the Humana investigator. However, he sent another email that same day to the co-conspirators and did not include the Humana investigator, in which he demanded to be paid for his share of the fraudulent scheme. This payment demand speaks volumes to Defendant's greed and his willingness to put his own interests ahead of the public and others. The need to deter both this defendant and other medical professionals from similarly exploiting their medical licenses or positions of trust and skills, and selling signatures in this manner is significant, and calls for the imposition of a guidelines sentence as contemplated by the plea agreement.

        Respectfully submitted,

        DAVID M. TOEPFER
        United States Attorney

   /s/ Michael L. Collyer
     Michael L. Collyer (OH: 0061719)
     Assistant United States Attorney
     United States Court House
     801 West Superior Avenue, Suite 400
     Cleveland, OH 44113
     (216) 622-3744
     Michael.Collyer@usdoj.gov